7 F.3d 234
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
June Eleonore Davis PIERCE, Janet Ellen Pierce Presgrave,
Albert Clair Pierce II, Susan Joy Pierce
Panchison, Catherine June Pierce Ward,
Plaintiffs-Appellants,
v.
BP CHEMICALS, INC., f/k/a Vistron Corporation f/k/a Standard
Oil Company of Ohio f/k/a Sohio Chemical Company f/k/a BP
Chemicals America, Inc., E.I. Du Pont de Nemours & Company,
Monsanto Company Defendants-Appellees.
 No. 92-3794.
 United States Court of Appeals, Sixth Circuit.
 Sept. 30, 1993.
 
 On Appeal from the United States District Court for the Northern District of Ohio, No. 90-01238, Kreuzler, J.
 
 N.D.Ohio
 
 1
 AFFIRMED.
 
 
 2
 Before RYAN and BOGGS, Circuit Judges; and ROSEN, District Judge.*
 
 
 3
 ROSEN, District Judge.
 
 
 4
 Plaintiffs, the wife and children of decedent Albert C. Pierce, Sr., appeal the decision of the district court granting Defendants' motion for summary judgment. The district court found that Plaintiffs' wrongful death action was time-barred by Virginia's two-year statute of limitations on personal injury actions.
 
 
 5
 Finding that Virginia's personal injury statute of limitations begins to accrue when medical evidence demonstrates that the injury first manifests itself and that decedent's injury manifested itself more than two years before his death, we affirm.
 
 I.
 
 6
 Plaintiffs' decedent, Albert C. Pierce, Sr., died on June 27, 1990, at age sixty-two, from colon cancer.
 
 
 7
 From 1967 until November 1989, the deceased was employed as a wet tow handler, senior tow handler, dye operator and maintenance worker at B.A.S.F. in Williamsburg, Virginia, a plant that produced acrylic fibers. As part of his job duties, he was exposed to acrylonitrile, a carcinogenic chemical that is the principal raw material in the manufacture of acrylic fibers. That chemical was sold to decedent's employer by Defendants.
 
 
 8
 Throughout the later years of his employment, decedent participated in an employer sponsored medical surveillance program for individuals exposed to acrylonitrile. As part of that program, decedent underwent physical examinations, including digital examinations of his rectum, sigmoidoscopies, exploratory examinations of the lower part of his descending colon, and hemocult tests and blood screens for early colon cancer detection. A digital exam, sigmoidoscopy and hemocult performed in December of 1987 were all negative.
 
 
 9
 On June 26, 1988 (two years and a day prior to his death), decedent, complaining of chills, sweating and a stomach ache, was seen by Dr. Nguyen at the emergency room at McDonald Army Hospital. All tests performed by Dr. Nguyen, including a rectal examination and a hemocult test, were normal. Dr. Nguyen, unable to determine the cause of decedent's symptoms, referred him to the Surgical Clinic.
 
 
 10
 The next day, June 27, 1988 (exactly two years prior to his death) decedent was seen by Dr. Charles Ellis. Dr. Ellis, on palpating decedent's abdomen, felt a fullness or mass that he believed was compatible with a cancer of the colon, the first indication that a colon cancer might have been present in decedent's body.
 
 
 11
 On June 30, 1988, decedent returned to the emergency room complaining of bright red blood in the area of his rectum.
 
 
 12
 Pierce underwent a barium enema on July 1, 1988 to confirm the suspicion that he had contracted colon cancer. The barium enema confirmed the fact that decedent had a tumor in the right side of his colon. To assess the other organs for possible metastatic disease, Dr. Ellis performed a CAT scan of the abdomen, and the results were normal.
 
 
 13
 Dr. Thomas Wheat surgically removed decedent's tumor on July 11, 1988. The pathology obtained during the surgery confirmed the presence of an adenocarcinoma of the cecum, the right colon, with involvement of four lymph nodes. The tumor was approximately six centimeters (approximately 2 and one-half inches) long and had partially obstructed the inside of the colon.
 
 
 14
 In November of 1989, decedent's physicians discovered that his colon cancer has metastasized to his liver. Decedent received a series of chemotherapy treatment cycles as an outpatient but his condition slowly deteriorated over the next several months resulting in his death on June 27, 1990.
 
 
 15
 On July 13, 1990, Plaintiffs filed the instant wrongful death action against the makers of acrylonitrile, alleging negligence and breach of warranties, and seeking punitive damages. On October 22, 1991, Defendants moved for summary judgment, alleging that the lawsuit was barred by Virginia's statute of limitations, and on April 20, 1992 the district court granted the motion. On May 14, 1992, Plaintiffs filed a motion to reconsider, and on July 2, 1992, the district court denied that motion. Plaintiffs filed an appeal to this Court on July 31, 1992.
 
 
 16
 With respect to when decedent's tumor developed, his surgeon, Dr. Wheat, testified at his deposition as follows:
 
 
 17
 Q. Doctor, you stated a few minutes ago that it would have been better if it had been found six months earlier. That means this cancer was there six months earlier?
 
 
 18
 A. I'm not sure I can state categorically, but my feeling is that a tumor the size of the one we removed from Mr. Pierce would have been present for at least six months.
 
 
 19
 Q. If Dr. Ellis could feel that tumor on the 26th or 27th of June, 1988, that tumor was certainly there, say, a month earlier, wasn't it, Doctor?
 
 
 20
 A. I would think that would be an accurate statement.
 
 
 21
 [September 1991 Deposition of Dr. Wheat at 60-70] (emphasis added).
 
 
 22
 Dr. Wheat also testified that decedent's tumor had progressed through two stages of cancer classification:
 
 
 23
 A. ... Now, the exact terminology is not that simple, There is a classification of colon cancers that was first arrived at Duke University, and it's called the Duke's classification, and it uses A, B, C, and D rather than stage 1, 2, and 3.
 
 
 24
 Q. This was a Duke's C?
 
 
 25
 A. Correct. As a general rule, the higher the letter, the poorer the prognosis or the more chance that the tumor will eventually recur.
 
 
 26
 Q. Doctor, are the various designations--A, B, C, and D--for the different degrees of development?
 
 
 27
 A. Yes, uh-huh.
 
 
 28
 Q. And this was Duke's C as we established?
 
 A. Yes
 
 29
 Id. at 57.
 
 
 30
 Dr. Artis Croslin, another one of decedent's treating physicians, who specializes in the treatment of cancer--testified as follows:
 
 
 31
 Q. Now, Doctor, my question to you is could that cancer have developed in a matter of a few days from initiation before that surgery?
 
 
 32
 A. It is not the usual course for it to--for it to develop in anything in regards to days.
 
 
 33
 Q. In fact, Doctor, based upon your training and experience, isn't it far more likely that this cancer developed over a period of an extended period of time, say, at least months, if not years?
 
 
 34
 Mr. Loupe [a government attorney who was present to represent Dr. Croslin since his treatment occurred at a navy hospital]: I'm going to object to the form of the question.
 
 
 35
 Are you referring specifically to Mr. Pierce or are you asking him to give an opinion based on his practice of oncology?
 
 
 36
 Q. Doctor, my question stands. I'll repeat it if you don't recall it; otherwise, I'd ask you to answer it.
 
 
 37
 A. I think this cancer started some months to years prior to the July '88 surgery.
 
 
 38
 Q. Why do you think that, Doctor?
 
 
 39
 A. The epidemiology, as we understand it, of cancer of colon cancer, in specific, is that there may be etiologic agents which may cause changes in the tissues, and these occurrences in general are not things that occur overnight, if you will, but are occurrences which occur over periods of time; maybe more than one insult, if you will, maybe not one particular cause, but rather a accumulation of causes tha add together to initiate the beginning of a cancer. So that general understanding leaves us to feel that cancers do not develop overnight.
 
 
 40
 Q. So whatever the etiology is, is it your testimony it's your opinion that it's a gradual progressive development of the disease that takes time in order to manifest in symptoms?
 
 
 41
 A. Yes. If one starts with normal tissue and then we feel that if one were to follow this, one could see a gradual change toward a cancerous development and then finally cancer.
 
 
 42
 Q. And these gradual changes certainly take more than a few days or a few weeks, don't they, Doctor?
 
 
 43
 A. It is felt to take--oh, yes.
 
 
 44
 [September 17, 1991 Video Deposition of Dr. Croslin at 43-44] (emphasis added).
 
 II.
 
 45
 In a thorough and thoughtful opinion, the district court granted Defendants' motion for summary judgment that Plaintiffs' wrongful death claims are time-barred by Virginia's statute of limitations. Recognizing that a plaintiff may bring a wrongful death claim on behalf of a decedent if (1) the plaintiff brings the claim within two years of a decedent's death, and (2) decedent could have filed a valid claim on the day of his death, the district court noted that Plaintiffs had complied with their filing requirements under the former requirement when they filed the instant action less than one month after decedent's death.
 
 
 46
 The district court then observed, quite correctly, that the crucial inquiry was whether decedent's personal injury action was time-barred at the time of his death. After noting that Virginia statute requires that all personal injury claims be brought within two years after a cause of action accrues, the court quoted the relevant Virginia statute, which states that actions accrue when the injury is sustained, not when the damage is discovered.
 
 
 47
 Finally, the district court applied the instant facts to the landmark Virginia Supreme Court case of Locke v. Johns-Manville Corp., 221 Va. 951, 275 S.E.2d 900, 904 (1981), which applies Virginia's statute of limitations to a case that, like the instant one, involved a suit for a latent disease. The district court cited language from that case which explained that the statute may begin to run before the disease is diagnosed or manifests itself by symptoms if medical testimony demonstrates with a reasonable degree of medical certainty that the injury occurred before the onset of the symptoms.
 
 
 48
 In applying the instant facts, the court cited the unrebutted deposition testimony of Drs. Wheat and Croslin and determined that their testimony demonstrated that decedent's cancerous tumor had been present more than two years before his death. The court held that the medical testimony demonstrated that although Dr. Ellis did not feel the presence of the tumor until June 27, 1988--exactly two years prior to decedent's death--and although the barium enema did not confirm the presence of cancer until July 1, 1988, and although the tumor was not surgically removed until July 11, 1988, the tumor existed prior to June 27, 1988 and, thus, the statute of limitations barred Plaintiffs' suit.
 
 
 49
 The court relied on (1) the medical testimony that said tumors took weeks or months to develop, (2) the fact that the cancer was officially diagnosed a very short time after the accrual date, and (3) that the cancer was in an advanced stage at the time of diagnosis. The district court held:
 
 
 50
 The Court reaches this holding solely because Mr. Pierce's advanced tumor could not have developed, within a reasonable degree of medical certainty, in the four days between that date and the barium enema on July 1, 1988. If the accrual cutoff date was, for example, a month earlier (May 27, 1988), the medical testimony presented to the Court may not have been sufficient to establish, as a matter of law, that Mr. Pierce had cancer before the date.
 
 
 51
 [April 20, 1992 Memorandum Opinion at 11] (emphasis added).
 
 
 52
 Finally, the court recognized the apparent inequity in the result but explained that it was a matter for the legislature not the courts:
 
 
 53
 Finally, the Court realizes the inequity that may result from its holding. The record indicates that Mr. Pierce's tumor may have developed over a long period of months or years, and it was virtually undetectable because of its location in the right colon. He could not have reasonably known the cancer was present until he had the surgery or the barium enema, yet his family's action against those who allegedly caused his death is still barred under Virginia law.
 
 
 54
 In response to the many injustices created by barring claims involving latent diseases, many jurisdictions have adopted a 'discovery rule' for such claims. Generally, the discovery rule states that a cause of action does not accrue until the plaintiff either discovers or, in the exercise of reasonable diligence, should have discovered the injury. While the purpose of statutes of limitations is to encourage the prompt filing of claims, and to protect defendants from stale claims where the search for truth may be seriously impaired by the loss of evidence, an injured plaintiff cannot possibly assert a claim until the plaintiff has or should have had notice that he or she has a claim to bring ... The discovery rule thus guarantees a plaintiff due process by not limiting the plaintiff's right to bring an action before the plaintiff has notice of the right.
 
 
 55
 The Court regrets that the Virginia legislature and courts have expressly rejected this rule. However, the Court cannot 'sit as a super legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare.' Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423 (1952). Any adoption of the discovery rule must come not from this Court, but from the Virginia legislature or the Virginia courts. Therefore, the Court is compelled to deny Plaintiffs their day in court.
 
 
 56
 Id. at 12-13 (citations and footnotes omitted).
 
 III.
 
 57
 Plaintiffs argue that the district court erred in granting Defendants' motion for summary judgment. They make two arguments: (1) decedent's personal injury action was viable at the time of his death on June 27, 1988 because it accrued on July 1, 1988 when a barium enema first revealed the probability that decedent had colon cancer; and (2) the medical evidence did not establish within a reasonable degree of medical certainty that decedent's colon cancer occurred before June 26, 1988.
 
 
 58
 In support of their first argument, Plaintiffs rely upon Virginia case law and argue that a reading of Locke v. Johns-Manville Corp., 221 Va. 951, 275 S.E.2d 900, 904 (1981) in conjunction with other Virginia law, demonstrates that a personal injury action for a latent disease does not accrue until the disease first becomes diagnosable within a reasonable degree of medical certainty. Next, Plaintiffs argue that Defendants have not offered any medical evidence that decedent's colon cancer was diagnosable earlier than two years before his death, since Dr. Wheat's retrospective speculation that decedent's cancer would have been present for at least six months prior to it being diagnosed is insufficient to form the basis of the accrual of the action. Finally, Plaintiffs argue that the district court's interpretation that the Locke accrual standard permits a cause of action to accrue even when there is no demonstrable injury outside of the limitations period is unprecedented.
 
 
 59
 In support of their second argument, Plaintiffs argue that the fact that decedent's colon cancer had metastasized to four lymph nodes and was classified as a Duke's C tumor related only to the probable success of surgical intervention, not the length of time the cancer existed. Next, Plaintiffs argue that Dr. Croslin did not opine, within a reasonable degree of medical certainty, the length of time cancer was present in decedent's body. Finally, Plaintiffs argue that Dr. Wheat's statements that decedent's tumor was present for at least six months were not opinions expressed to a reasonable degree of medical certainty.
 
 
 60
 Defendants counter by citing the Virginia statute and the Locke decision, which mandate that the statute of limitations begins to run immediately upon the inception of decedent's colon cancer. Further, they argue that decedent's cancer was present more than two years before his death. In support of this argument, Defendants cite the medical testimony and argue that it is contrary to common sense to contend that decedent's tumor had grown so large (two and one-half inches) that it could be felt on external examination on the afternoon of June 27, 1988 but that it did not exist a day or two earlier. Defendants argue that doctors need not explicitly say the words "to a reasonable degree of medical certainty" in order to express that opinion to such a certainty. Finally, Defendants contend that even if diagnosability were the standard, decedent's cancer was diagnosable more than two years before his death, because the barium enema that detected cancer on July 1, 1988 could have detected cancer five days earlier.
 
 IV.
 
 61
 This Court reviews de novo a district court's grant of summary judgment, applying "the same test as that used by the district court in reviewing a motion for summary judgment." Berlin v. Michigan Bell Tel. Co., 858 F.2d 1154, 1161 (6th Cir.1988). Thus, the Court should grant summary judgment if there is no genuine issue of material fact.
 
 
 62
 In the instant case, the district court properly applied the summary judgment standard. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 63
 Three 1986 Supreme Court decisions-- Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)--ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[1] According to the Celotex Court,
 
 
 64
 In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.
 
 
 65
 Celotex, 477 U.S. at 322.
 
 
 66
 After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:
 
 
 67
 * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
 
 
 68
 * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
 
 
 69
 * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
 
 
 70
 * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
 
 
 71
 * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.
 
 
 72
 See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir.1989).
 
 V.
 A.
 
 73
 This Court agrees with the district court's determination that the Virginia statute of limitations began to accrue as soon as colon cancer began to develop in decedent's body.
 
 
 74
 An action for personal injuries in Virginia must be brought within two years after the accrual of the cause of action. Under Virginia Code § 8.01-230, the point of accrual of the cause of action is specifically deliniated as follows:
 
 
 75
 Accrual of cause of action.--In every action for which a limitation period is prescribed, the cause of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person ... and not when the resulting damage is discovered, except where the relief sought is solely equitable or where otherwise provided ...
 
 
 76
 Virginia Code § 8.01-230 (emphasis added). Another section provides, "Unless otherwise provided in this section or by other statute, every action for personal injuries, whatever the theory of recovery ... shall be brought within two years after the cause of action accrues." Virginia Code § 8.01-243(A).
 
 
 77
 If within two years from the date of the accrual of the cause of action, an individual entitled to bring such an action dies as a result of his personal injuries without having filed such an action, a wrongful death action may be instituted within two years of his death. Virginia Code § 8.01-244.[2]
 
 
 78
 Since Plaintiffs filed their lawsuit within two weeks of decedent's death, the sole issue presented in the instant case is whether decedent had a viable personal injury action at the time of his death, i.e., whether decedent's action accrued prior to June 26, 1988 (two years and a day before his death).[3]
 
 
 79
 The Virginia Supreme Court, in Locke v. John-Manville Corp., 221 Va. 951, 275 S.E.2d 900 (1981), expressly addressed the issue of the accrual of a personal injury action for a latent disease, such as decedent's colon cancer. In that case, the plaintiff was exposed to asbestos dust from defendants' thermal insulation products from 1948 until 1972. On November 1, 1977, the plaintiff experienced shortness of breath and sought medical attention, but chest x-rays as late as April 14, 1978 were normal. On May 22, 1978, however, additional chest x-rays revealed an abnormality in his lungs, and surgery in June of that year led to the diagnosis of a cancer tumor in the lining of his lungs. The plaintiff filed suit in July of 1978.
 
 
 80
 The defendants moved for summary judgment arguing that the plaintiff's cause of action accrued no later than the date of his last injurious exposure to an asbestos product, more than five years before he filed suit, and the trial court granted the defendants' motion.
 
 
 81
 The Virginia Supreme Court reversed and held that accrual was not "keyed to the date of the wrongful act," but rather "the running of the time is tied to the fact of harm to the plaintiff, without which no cause of action would come into existence." Id. at 904. The court defined "injury" under § 8.01-230 to mean "positive, physical or mental hurt to the claimant, not legal wrong to him in the broad sense that his legally protected interests have been invaded." Id. at 904.
 
 
 82
 The Locke court explicitly rejected a discovery rule that would have based the accrual of a cause of action on when the plaintiff knew or should have known of his injury. Rather, the court held that "the cause of action accrued and the statute of limitations began to run from the time the plaintiff was hurt." Id. The Locke court acknowledged that the crucial question is, "When was the plaintiff hurt?". Holding that the answer lies in the medical evidence, the court set up the following rule:
 
 
 83
 [T]he cause of action accrued and the statute of limitations began to run from the time plaintiff was hurt. The 'time plaintiff was hurt' is to be established from available competent evidence, produced by a plaintiff or a defendant, that pinpoints the precise date of injury with a reasonable degree of medical certainty.
 
 
 84
 Id.
 
 
 85
 Thus, the court concluded that "the hurt--the harm--the injury" in that case was the plaintiff's tumor, and the court recognized that the tumor "manifestly occurred before [it] ... was diagnosed." Id. (emphasis added).
 
 
 86
 Most importantly to the instant case, the unanimous Virginia Supreme Court proceeded to state specifically that the statute of limitations could run before any diagnosis, discovery, impairment of function, or any pain, discomfort or other symptom resulted from the tumor:
 
 
 87
 Thus, we do not hold that the foregoing rule means the limitation period does not begin to run until the initial diagnosis is communicated to the victim or even until the first diagnosis is actually made. We merely conclude that the accrual point is when damage occurs. Under this rule, it is conceivable that when the disease manifests itself by symptoms, such as pain, discomfort or impairment of function, expert medical testimony will demonstrate the injury occurred weeks, months or even years before onset of the symptoms. Thus, the cause of action would accrue and the limitations period would run from the earlier and not the later time.
 
 
 88
 * * *
 
 
 89
 * * *
 
 
 90
 [T]he rule we have just articulated is not a so-called 'discovery' rule ... [A]doption of a discovery rule, which triggers the running of the statute only when the injury is discovered or should have been discovered in the exercise of reasonable diligence, must be accomplished by the General Assembly.[4]
 
 
 91
 Id.
 
 
 92
 The Locke court concluded by saying that "[a] disease like this cancer must first exist before it is capable of causing injury. To hold otherwise would result in the inequity of barring the mesothelioma plaintiff's cause of action before he sustains injury." Id. at 906 (emphasis added).
 
 
 93
 In that case, the court held that the statute of limitation did not bar the plaintiff's action, since his action accrued either in November 1977 (when he first experienced chest problems) or May 1978 (the time of the x-rays)--both of which were within two years of the date the suit was filed.
 
 
 94
 Finally, the Locke opinion explained that its decision was consistent with prior Virginia cases. In particular, the court explained that Caudill v. Wise Rambler, Inc., 210 Va. 11, 168 S.E.2d 257 (1969) and Louisville and Nashville Railroad v. Saltzer, 151 Va. 165, 144 S.E. 456 (1928) were consistent with Locke in that they held that the limitation period did not accrue until an injury occurred.
 
 
 95
 In Saltzer, the defendant railroad appealed a jury verdict rendered against it for altering the course of a river which flowed through the plaintiff's land. Among other claims of error, the railroad argued that the plaintiff's claim was barred, because any cause of action for the erosion to the plaintiff's land caused by the altered water course accrued when the course was altered and the water began rising, not when the high water came years later. The Virginia Supreme Court held that the action did not accrue until the injury could be shown:
 
 
 96
 [W]here the damage ... arises from a cause not then immediately effective, ... the cause of action does not arise until the injury can be shown. The reason and justice of this is perfectly apparent, for a plaintiff who merely feared ultimate damage ... under such circumstances would invite defeat if he only relied upon his fears and was unable to prove any actual damage. So the courts have formulated the general rule thus: Whenever any injury, however slight it may be, is complete at the time the [act or omission] is completed, the cause of action then accrues; but, whenever the [act or omission] is not legally injurious, there is no cause of action until such injurious consequences occur, and it accrues at the time of such consequential injury.
 
 
 97
 Id. at 170-71, 144 S.E. at 457 (emphasis added) (quoting Southern Ry. Co. v. Leake, 140 Va. 438, 441, 125 S.E. 314, 315 (1924)).
 
 
 98
 Thus, the Saltzer court refused to hold that the limitation period began to accrue when the water first started rising, because the plaintiff would have been unable to show any injury at that time. Had the plaintiff been able to show "any" injury, no matter how "slight," at the time the water first began rising, that court would have held that the statute of limitations began to run from that earlier period.
 
 
 99
 Likewise, in Caudill v. Wise Rambler, Inc., 210 Va. 11, 168 S.E.2d 257 (1969), the Virginia Supreme Court held that a plaintiff's cause of action does not begin to accrue until some injury occurs. In that case, the plaintiff suffered personal injuries in an automobile accident in January of 1967 as a result of a defective steering column and brought a property and personal injury action. The lower court held that the cause of action accrued at the time the plaintiff purchased the automobile in 1964 and granted judgment for the defendant. Although the Virginia Supreme Court agreed that the action for property damage accrued at the time that the defendant sold the plaintiff the defective car (and thus was time-barred), the court held that the plaintiff's personal injury action did not accrue until she was injured:
 
 
 100
 Obviously, since the plaintiff had not been injured at the time she purchased the car, she could not then maintain an action for her injuries. To say, then, that her right of action accrued before her injuries were received is to say that she was without remedy to recover damages for her alleged injuries. Such an unjust and inequitable result is not the purpose of statutes of limitation.
 
 
 101
 Id. at 12-13, 168 S.E.2d at 259.
 
 
 102
 Courts that have dealt with the accrual of the Virginia statute of limitations subsequent to Locke have remained true to that decision and have held that actions are barred where medical evidence demonstrates that "damage" existed more than two years prior to the plaintiff's filing. See Large v. Bucyrus-Erie Co., 524 F.Supp 285 (E.D.Va.1981), aff'd, 707 F.2d 94 (4th Cir.1983); Joyce v. A.C. & S., Inc., 591 F.Supp. 449 (W.D.Va.1984), aff'd, 785 F.2d 1200 (4th Cir.1986); Scarpa v. Melzig, 237 Va. 509, 379 S.E.2d 307 (1989).
 
 
 103
 In Large, a quarry employee brought a products liability action against the manufacturer of power shovels to recover for respiratory diseases and hearing loss allegedly sustained when the plaintiff operated the machines. The district court applied Locke v. Johns-Manville to determine whether the injury occurred more than two years before the plaintiff filed his suit.
 
 
 104
 The plaintiff in Large filed suit November 3, 1980, arguing inter alia that he did not suffer injury until a time within two years of filing his suit. The district court discussed Locke and its holding that "if expert medical testimony demonstrates that the injury occurred before the time when the disease manifested itself by symptoms, the statute begins to run from the earlier date." 524 F.Supp. at 287. Further, the court noted that Locke had partially relied on cases that held the "the time of discovery of plaintiff's injury, and the difficulty of such discovery, are irrelevant." Id. at 290.
 
 
 105
 Thus, the district court relied on the uncontroverted medical testimony of a doctor who testified that as of November 1980 the plaintiff "was suffering from no pulmonary disease or process which was not evident in August 1978 or before ..." Id. at 288. See Large, 707 F.2d 94, 96 (4th Cir.1983). As for the plaintiff's loss of hearing, medical testimony indicated that he had experienced hearing loss since April 1977.
 
 
 106
 Therefore, the district court granted summary judgment for the defendant:
 
 
 107
 Certainly, plaintiff was suffering from respiratory ailments long before November 3, 1978, two years before this suit was filed. Although Dr. Donlan's affidavit does not 'pinpoint' the occurrence of plaintiff's injuries with any degree of specificity, it does establish that all of the respiratory injuries of which plaintiff complains occurred more than two years before his suit was filed ...
 
 
 108
 Large, 524 F.Supp. at 288-89.
 
 
 109
 The appellate court affirmed the Large district court:
 
 
 110
 [T]he uncontroverted testimony of the expert witnesses established that both the respiratory diseases and the hearing loss existed and were evident more than two years prior to the institution of the suit. Although this evidence does not pinpoint the exact date of injury, it is competent evidence that establishes, to a reasonable degree of medical certainty, that the injury occurred outside the two year period allowed by Va.Code § 8.01-243(A).
 
 
 111
 Large, 707 F.2d at 97.
 
 
 112
 Similarly, in Joyce v. A.C. & S., Inc., 591 F.Supp. 449 (W.D.Va.1984), aff'd, 785 F.2d. 1200 (4th Cir.1986), the plaintiff brought a personal action against various miners and manufacturers of asbestos. Relying on Locke, the district court granted summary judgment, since the plaintiff's injury developed more than two years before his suit. The appellate court affirmed the district court. In addition to discussing Locke, the appellate court analyzed other cases, since the Joyce case also involved the question of whether the statute of limitations begins to run anew for each successive injury caused by the same wrongful act.
 
 
 113
 In discussing that issue, the Fourth Circuit quoted Virginia case law that recognized only one cause of action for all injuries sustained:
 
 
 114
 [W]here an injury, though slight, is sustained in consequence of the wrongful or negligent act of another and the law affords a remedy therefor [sic] the statute of limitations attaches at once. It is not material that all of the damages resulting from the act should have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.
 
 
 115
 Joyce, 785 F.2d at 1204 (quoting Caudill v. Wise Rambler, Inc., 210 Va. 11, 168 S.E.2d 257 (1969)).
 
 
 116
 Finally the Fourth Circuit in that case, like the district court in the instant case, discussed the inequitable results of Virginia's statute but stressed that it was not for a federal court to change:
 
 
 117
 We recognize that this rule may effectively preclude recovery for serious injuries that develop more than two years after an initial hurt, however slight, given the difficulty of proving future damages when the fact and extent of future injury is unknown. Although the indivisible cause of action theory is readily justified in cases of traumatic injury, where all damages are generally immediately apparent, its result may be harsh when applied to asbestos-related or to other "creeping disease" cases where, by definition, there may be gaps between the onset of various distinct injuries caused by exposure to asbestos. We are not, of course, at liberty to modify the rule. Any change in favor of asbestos or other latent disease plaintiffs must come from the Supreme Court of Virginia or the General Assembly of that state.
 
 
 118
 Id. at 1205 (emphasis added).
 
 
 119
 An even more dramatic example of the seemingly inequitable results of Virginia's statute is Scarpa v. Melzig, 237 Va. 509, 379 S.E.2d 307 (1989). That case involved a negligent act whose consequences did not become known until later and did not involve a latent disease. However, that case demonstrates that under Virginia law, the presence of an undetected "injury" in a person's body starts the running of the statute of limitations.
 
 
 120
 In Scarpa, the plaintiff filed a medical malpractice lawsuit claiming that she was damaged in 1984 when she became pregnant following a negligently performed sterilization procedure performed in 1980. The Virginia Supreme Court affirmed summary judgment against the plaintiff, even though there was no evidence until 1984 that the 1980 sterilization had been negligently performed, even though the plaintiff did not have any pain or manifestation of any symptoms until 1984, and even though the plaintiff did not discover that the sterilization had been improperly performed until 1984. The Scarpa court cited Locke and explained:
 
 
 121
 [W]hen any injury, though slight, is sustained as the consequence of an alleged wrong, the right of action for a personal injury accrues and the statute of limitations begins to run at once. It is immaterial that all the damages resulting from the wrong may not have been sustained at the time of the negligent act; the running of the statute of limitations is not postponed by the fact that substantial damages do not occur until a later date.
 
 
 122
 * * *
 
 
 123
 * * *
 
 
 124
 Therefore, immediately upon completion of the negligently performed 1980 surgery, the plaintiff had a cause of action and a right of action to recover for the trauma, the harm, and the hurt caused during the failed procedure. It is immaterial that the substantial damages of a pregnancy did not occur until a later date. Likewise, it is immaterial that the incomplete surgery was not discovered until later.
 
 
 125
 Id. at 309-10 (citations omitted and emphasis added).
 
 
 126
 Accordingly, in the instant case, the statute of limitations began to run as soon as soon as decedent's colon cancer formed (or was present) in his body. That the cancer was not discovered until Dr. Ellis' physical examination on June 27, 1988, the barium enema on July 1, 1988, or the actual surgery on July 11, 1988, is immaterial. Likewise, as Locke and Joyce make clear, it is immaterial that Plaintiff's injury might have been difficult to prove had he brought his case earlier. Finally, as Scarpa demonstrates, it is immaterial that Plaintiff would have had no reason to suspect that something was wrong and submit to a thorough examination any sooner than he did.
 
 
 127
 Although compelling from a humane perspective--and, perhaps, even from a common-sense point of view--Plaintiffs' argument that the statute of limitations does not begin to run until the cancer becomes "diagnosable" within a reasonable degree of medical certainty is not supported, or supportable, by either the language of the statute or prevailing decisional precedent. Clearly, the Virginia Supreme Court was free to render such a holding in Locke. However, the court specifically held that "the accrual point is when damage occurs" and "[u]nder this rule, it is conceivable that ... expert medical testimony will demonstrate the injury occurred weeks, months or even years before onset of the symptoms," and in such a case, "the cause of action would accrue and the limitations period would run from the earlier and not the later time." Locke, 275 S.E.2d at 905. Nowhere did the court mention that medical testimony would have to establish that the disease was diagnosable; rather such evidence merely must establish that the cancer was present at an earlier period.
 
 
 128
 Plaintiffs' reliance on Caudill v. Wise Rambler, 210 Va. 11, 168 S.E.2d 257 (1969) and Louisville and Nashville Railroad v. Saltzer, 151 Va. 165, 144 S.E. 456 (1928) is equally unavailing. Both of those decisions are consistent with Locke 's statement that the limitation period accrues at the period at which medical testimony shows the disease became present.
 
 
 129
 In Saltzer, the court said the statute accrues upon the presence of "any" injury no matter how "slight." Thus, although that plaintiff could not be expected to sue before the water had done any damage to his land, he could be expected to bring the suit as soon as it did any damage.
 
 
 130
 Likewise, although the Caudill plaintiff's cause of action for personal injury did not accrue before her accident, it accrued as soon as she was able to show some injury.
 
 
 131
 Thus, in the instant case, the statute of limitations did not accrue before cancer had formed in decedent's body, because at such a time, decedent would not have been able to sustain a cause of action. However, the statute of limitations began to accrue as soon as cancer formed in decedent's body, since at that time, the decedent could have maintained an action for damages.
 
 
 132
 Therefore, the instant inquiry is whether Plaintiff's colon cancer formed (or was present) more than two years before his death.
 
 B.
 
 133
 Decedent's colon cancer existed more than two years prior to his death. According to the Locke court, "The 'time plaintiff was hurt' is to be established from available competent evidence, produced by a plaintiff or a defendant, that pinpoints the precise date of injury with a reasonable degree of medical certainty." Locke, 275 S.E.2d at 905. However, the Virginia Supreme Court proceeded to explain that statement as follows: "Under this rule, it is conceivable that when the disease manifests itself by symptoms, such as pain, discomfort or impairment of function, expert medical testimony will demonstrate the injury occurred weeks, months or even years before onset of the symptoms." Id.
 
 
 134
 That the Virginia Supreme Court did not explicitly state in its later explanation of the rule that the medical testimony must indicate the date with a "reasonable degree of medical certainty" indicates that the court did not intimate more than it expressly stated--"medical testimony [must] demonstrate" when the injury occurred.
 
 
 135
 Initially, this Court notes that it agrees with the Fourth Circuit's decision in Large, supra, where that court held that it was unnecessary to "pinpoint the exact date of injury," as long as the evidence demonstrated that "the injury occurred outside the two year period...." Large, 707 F.2d at 97. Thus, it is sufficient if the medical testimony establishes that decedent's cancer formed more than two years before his death; such evidence need not indicate the exact date.
 
 
 136
 The Court finds that the testimony of Drs. Wheat and Croslin, and the size and stage of the tumor, demonstrate that decedent's colon cancer existed before June 26, 1988.
 
 1.
 
 137
 As noted above, Dr. Wheat testified as follows: "[M]y feeling is that a tumor the size of the one we removed from Mr. Pierce would have been present for at least six months." In response to the question of whether Dr. Ellis's ability to feel the tumor on June 27, 1988 indicated that the tumor was present a month before, Dr. Wheat answered, "I would think that would be an accurate statement."
 
 
 138
 Plaintiffs argue that Dr. Wheat's "feeling" and "thinking" constitute nothing more than speculation and thus fail to rise to the level of a reasonable degree of medical certainty. Defendants assert that Plaintiffs should not be able to argue this point, since they never raised the issue in the lower court. Moreover, Defendants point out that Virginia law does not require that a physician incorporate the exact words "within a reasonable degree of medical certainty" into his testimony.
 
 
 139
 Generally, this Court will not entertain arguments raised for the first time on appeal. See, e.g., White v. Anchor Motor Freight, Inc., 899 F.2d 555, 559 (6th Cir.1990) ("This court will not decide issues or claims not litigated before the district court."); Taft Broadcasting Co. v. United States, 929 F.2d 240, 243 (6th Cir.1991) ("A long line of cases in this circuit strongly reinforces the principle that issues not litigated in the trial court are generally not appropriate for appellate consideration in the first instance."). However, even if the Court considers Plaintiffs' argument, it is unavailing.
 
 
 140
 As discussed above, it is not clear that the Locke court meant to require anything other than medical evidence that demonstrates when the injury first took place (when the cancer first formed). Clearly, Dr. Wheat's testimony satisfies that standard, since it demonstrates that decedent's cancer formed more than two years before his death.
 
 
 141
 Moreover, even if the Court were to read Locke as requiring the evidence to be to a "reasonable degree of medical certainty," the Court is satisfied that Dr. Wheat's testimony meets that standard.
 
 
 142
 Virginia law does not impose any formal requirement that a medical expert's opinion include "the talismanic words 'reasonable medical certainty.' " Westmoreland Coal Co. v. Campbell, 372 S.E.2d 411, 416 (Va.App.1988). In Virginia, the reasonable medical certainty standard is satisfied by any words that indicate that the claimed relationship of fact is "more probable than not," or "reasonably probable." See, e.g., Cook v. City of Waynesboro Police Dept., 300 S.E.2d 746, 748-49 (Va.1983) (Virginia Supreme Court affirmed denial of compensation for heart disease claim based on general testimony that the disease was "generally thought" to be congenital in nature).
 
 
 143
 The Court is satisfied that Dr. Wheat's statements satisfactorily establish to a reasonable degree of medical certainty that at the time of the surgery on July 11, 1988, the tumor existed "at least six months." Dr. Wheat's use of phrases like "it is my feeling" does not indicate that the opinion was not to a reasonable degree of medical certainty. Rather, such a phrase is merely a manner of speaking that indicates that the person is speaking for himself. Such an expression does not indicate that the physician was unsure about the answer. That this is the case is evidenced by Dr. Wheat's statement that the cancer was present "at least" six months. Certainly, if he was unsure, he would not have indicated that the period was "at least" a certain amount of time before decedent's death.
 
 2.
 
 144
 Dr. Croslin testified that "[i]t is not the usual course for it [colon cancer] to--for it to develop in anything in regards to days." He also testified, "I think this cancer started some months to years prior to the July '88 surgery." Finally, he acknowledged that the changes between stages in cancer take more than a few days or weeks. [September 17, 1991 Video Deposition of Dr. Croslin at 43-44]
 
 
 145
 Similarly, Plaintiffs allege that Dr. Croslin's testimony is too uncertain to support a finding to a reasonable degree of medical certainty. In addition, Plaintiffs maintain that Dr. Croslin also testified to a large extent that it was impossible to say exactly when the cancer first started forming. Further, Plaintiffs argue that Dr. Croslin merely testified in general, not about decedent's cancer in particular.
 
 
 146
 Just as with Dr. Wheat's testimony, the Court finds that Dr. Croslin's testimony satisfies the Locke standard and sufficiently indicates that the cancer began forming more than two years before decedent's death.
 
 
 147
 The Court acknowledges that later in his deposition, Dr. Croslin also testified that the date the cancer began forming is uncertain:
 
 
 148
 Q. Doctor, are you capable of stating within a reasonable degree of medical certainty exactly when Mr. Pierce's colon cancer appeared in his body?
 
 
 149
 A. I think that no one can do that.
 
 
 150
 Q. It would be guessing; is that correct?
 
 
 151
 A. It would be a summation at best.
 
 
 152
 * * *
 
 
 153
 * * *
 
 
 154
 Q. ... Isn't it your opinion, to a reasonable degree of medical certainty, that if we go back again to July of 1988 when Mr. Pierce had the tumor removed from his colon, that you would have an opinion to a reasonable degree of medical certainty that that tumor, given what was removed and what was seen in the pathology report, had to have been there at least 60 days before; isn't that a reasonable conclusion, Doctor?
 
 
 155
 A. It would be reasonable to assume that disease was there some period of time before the surgery.
 
 
 156
 Q. At least a few months, Doctor?
 
 
 157
 Objection. He's answered the question.
 
 
 158
 A. I mean, again, I'm attempting not to put a time limit on it because I don't think there can be.
 
 
 159
 * * *
 
 
 160
 * * *
 
 
 161
 Q. Doctor, I understand we can't put a specific date on it, but I'm asking you, in your opinion--and I thought we established this on cross-examination--tumors like this can't grow in a matter of weeks or days?
 
 
 162
 A. That is true. And, again, I hesitate to put a particular time limit on it. I'll just say that it would take some period of time, and not measured in days, in order for a tumor to grow. From its inception, we talk perhaps not--you can't measure it in weeks. Again, I can't speak of this particular case because I don't know the biology of his particular cancer, but in general that is true.
 
 
 163
 Q. So in general, some specific period of time that's going to be longer than weeks?
 
 
 164
 A. Longer than weeks.
 
 
 165
 * * *
 
 
 166
 * * *
 
 
 167
 Q. Doctor, you do not have an opinion within a reasonable degree of medical certainty as to when Mr. Pierce's colon cancer appeared in his body; is that correct?
 
 
 168
 A. I don't put any time frame on when it presented, no.
 
 
 169
 Q. The questions counsel were asking you, were you referring in general? That is, you weren't referring specifically to Mr. Pierce; is that correct?
 
 
 170
 A. By no means. It was in general.
 
 
 171
 [September 17, 1991 Deposition of Dr. Croslin at pp. 70-80].
 
 
 172
 The above testimony does not negate the Court's finding that, based on Dr. Croslin's testimony from pp. 43-44 of his deposition, there is sufficient evidence that decedent's cancer began forming more than two years before his death. That he is unable to identify exactly when the cancer started to form is irrelevant. Granted, he was reluctant to put an exact date on the formation. However, his overall testimony indicates that whenever it formed, it formed prior to June 26, 1988.
 
 
 173
 Also, the Court rejects Plaintiffs' argument that Dr. Croslin testified in general. First, "general" medical testimony is not necessarily insufficient. Second, it was only in his testimony at pages 70-80 that he answered questions with reference to cancer "in general." His earlier testimony, at pages 43-44, was not stated in generalities, nor did he later say that he was there testifying as to cancer in general. ("I think this cancer started some months to years prior to the July '88 surgery.").
 
 3.
 
 174
 Decedent's tumor removed on July 11, 1988 was approximately two and one-half inches long and was classified as a Class "C" tumor. Dr. Wheat testified that a tumor grows from a class "A" to "B" to "C" to "D". Although Plaintiffs argue that the size and stage was only relevant to decedent's prognosis, they overlook the obvious. Granted, Dr. Wheat testified that the stage was significant because it affected decedent's prognosis, however, that the tumor had grown to two and one-half inches in length and had grown to the third stage, further supports a finding that it was present before June 26, 1988.
 
 
 175
 After all, it belies common sense to argue that a two and one-half inch tumor that was surgically removed on July 11, 1988 was not there seventeen days earlier. Similarly, it belies common sense to argue that two and one-half inch tumor whose presence was confirmed by a barium enema on July 1, 1988, was not present seven days earlier. Finally, it belies common sense to suggest that a two and one-half inch tumor whose presence was felt upon a physical examination on June 27, 1988, was not present thirty-seven hours earlier.
 
 
 176
 Therefore, the Court finds that the uncontroverted medical testimony and the sheer size and development of the tumor support a finding that as a matter of law the decedent's colon cancer existed prior to June 26, 1988. Like the district court, this Court would be hesitant to find that the cancer existed more than a month before June 26, 1988, but the evidence clearly supports a finding that it existed at least a day before June 26, 1988.
 
 VI.
 
 177
 Thus, since decedent's cancer existed more than two years before his death, his cause of action accrued more than two years before his death. Since Virginia's statute of limitations bars Plaintiffs' cause of action, the district court properly granted Defendants' motion for summary judgment. In this context, the Fourth Circuit's statement is particularly apropos,
 
 
 178
 We recognize that this rule may effectively preclude recovery for serious injuries that develop more than two years after an initial hurt, however slight, given the difficulty of proving future damages when the fact and extent of future injury is unknown ... We are not, of course, at liberty to modify the rule. Any change in favor of asbestos or other latent disease plaintiffs must come from the Supreme Court of Virginia or the General Assembly of [Virginia].
 
 
 179
 Joyce v. A.C. & S., Inc., 785 F.2d. 1200, 1205 (4th Cir.1986).
 
 
 180
 Although we recognize that this rule may, in cases such as this, produce harsh and inequitable results and may be difficult of application, we agree that the remedy lies with the Virginia legislature or supreme court. Therefore, we AFFIRM.
 
 
 
 *
 Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 29 (1991 Supp.)
 
 
 [2]
 This section provides in part:
 B. Every action ... shall be brought by the personal representative of the decedent within two years after the death of the injured person ...
 Virginia Code § 8.01-244(B).
 
 
 [3]
 In the proceedings before the trial court, counsel framed the issue as whether decedent's cause of action accrued prior to June 27, 1988 (exactly two years before his death), and this is the date upon which the district based its analysis. Now, on appeal, Plaintiffs argue that Virginia Code § 1-13.3 provides that in computing time, the time shall be allowed in addition to the day on which the event occurred--thus, this Court must find that decedent's action accrued before June 26, 1988, not June 27, 1988. Defendants dispute this position and maintain that Plaintiffs should not be able to raise this issue for the first time on appeal. However, since the difference of one day is immaterial to the district court's finding that the cancer was present in decedent's body a period of time before June 27, 1988, this Court will use the earlier date and give Plaintiffs the benefit of the doubt
 
 
 [4]
 In fact, the Virginia General Assembly has acted to rectify this apparent inequity with respect to asbestos and breast implant plaintiffs. For those plaintiffs, Virginia has recently adopted a "discovery" statute of limitations that does not begin to run until such information is first communicated to the plaintiff. See Virginia Code § 8.01-249(4) and (7). That the Virginia legislature has not enacted similar legislation for plaintiffs with other latent diseases (like the instant Plaintiff) demonstrates its intention to treat their causes of action as accruing under the provisions of the existing statute